[No. F018964. Fifth Dist. Mar. 23, 1994.]

PHILLIP D. BERTELSEN, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO et al., Real Parties
in Interest.

**COUNSEL**

Marrs & Robbins and Williams S. Marrs for Petitioner.

J. Antonio Barbosa and Robert H. Murray for Respondent.

No appearance for Real Parties in Interest.

## OPINION

## VARTABEDIAN, J.—

### INTRODUCTION

At the times relevant to this case, it was settled law under the National Labor Relations Act (NLRA)[1] and the Immigration and Nationality Act (INA)[2] that nonagricultural workers were not entitled to remedial backpay during any period when they were not present in the United States. (*Sure-Tan, Inc.* v. *NLRB* (1984) 467 U.S. 883, 903 [81 L.Ed.2d 732, 750, 104 S.Ct. 2803].) (The NLRA does not apply to agricultural workers. (29 U.S.C. § 152(3).))

Prior to *Sure-Tan*, the immigration status of a worker made no difference in the available remedies under the NLRA. (*Local 512, Warehouse & Office Workers* v. *N.L.R.B.* (9th Cir. 1986) 795 F.2d 705, 717-719, collecting cases.) Since *Sure-Tan*, there has been a split in the federal appellate courts whether NLRB make-whole remedies are available for undocumented workers who are physically present in the United States, even though their presence is illegal or they are not authorized to be employed. (Compare *Del Rey Tortilleria, Inc.* v. *N.L.R.B.* (7th Cir. 1992) 976 F.2d 1115, with *id.* at pp. 1123-1125 (dis. opn. of Cudahy, J.) and *E.E.O.C.* v. *Hacienda Hotel* (9th Cir. 1989) 881 F.2d 1504, 1517.)

Before the Migrant and Seasonal Agricultural Worker Protection Act (Pub.L. No. 97-470 (Jan. 14, 1983) 96 Stat. 2583, as amended, 29 U.S.C. § 1801 et seq. [MSPA]) took effect, it was settled law in California that agricultural workers actually present in the United States, regardless of their immigration status, could receive backpay as part of the Agricultural Labor Relations Board's (ALRB or Board) remediation of unfair or discriminatory labor practices. (See *Rigi Agricultural Services, Inc.* (Nov. 21, 1985) 11 ALRB No. 27, pp. 3, 11.)

In the present case, we consider whether the INA and MSPA, as they existed at the times here relevant, preempted California's use of the make-whole remedy to protect 13 Salvadoran refugees from unfair and discriminatory labor practices by their harvesting company employer. We conclude

---

[1] Act of July 5, 1935, chapter 372, 49 Statutes at Large 449, as amended, 29 United States Code section 151 et seq.

[2] Act of June 27, 1952, chapter 477, 66 Statutes at Large 166, as amended, 8 United States Code section 1101 et seq. The INA was substantially overhauled by the Immigration Reform and Control Act of 1986 (IRCA), Public Law No. 99-603 (Nov. 6, 1986) 100 Statutes at Large 3359, effective July 1, 1987. The effect of these amendments, as relevant, will be discussed below.

the state was empowered to provide this remedy, and we affirm the order of respondent ALRB.

## FACTS AND PROCEEDINGS

On January 31, 1985, after a lengthy disagreement with management about the quality of the grove and the quality of the crew's work, the members of Gilberto Trevino's crew refused to harvest oranges unless the bin rate was increased from $9.50 to $12.[3] The next day, petitioner's supervising employee directed Trevino to fire 13 named crew members, referred to in the record and herein as "the discriminatees." Trevino told some members of the crew that the firings were because of the "strike" the previous day.

The United Farm Workers of America filed charges with the ALRB. After an evidentiary hearing, an administrative law judge (ALJ) found that the discriminatees had been fired because of their concerted activities seeking to improve their wages, protected activity under the Agricultural Labor Relations Act (ALRA) (Lab. Code, §§ 1152, 1153). That finding was affirmed by the ALRB, through a three-member panel, in a decision and order filed December 30, 1986. (*Phillip D. Bertelsen, dba Cove Ranch Management, supra,* 12 ALRB No. 27.) Inter alia, the decision and order required petitioner to reinstate the discriminatees and pay them lost wages. Petitioner did not seek judicial review of the ALRB decision.

After receiving a letter from petitioner offering reinstatement, each discriminatee appeared for work on March 24, 1986. Petitioner refused to immediately reinstate the discriminatees or pay them back wages because they failed to present documents showing they were authorized to work.[4]

In subsequent proceedings to enforce the ALRB order, an ALJ found that petitioner owed the 13 discriminatees backpay totaling $60,148.03. The ALJ found that the discriminatees were not authorized by the Attorney General to work in the United States; however, petitioner was estopped to rely on that factor. The ALRB affirmed the ALJ order, but not on the estoppel basis. Instead, the ALRB determined that petitioner had not met its burden of proving that the discriminatees were not work authorized. (*Phillip D. Bertelsen, Inc., dba Cove Ranch Management* (Nov. 29, 1990) 16 ALRB No. 11, at p. 4.)

---

[3]In reciting the facts contained in this paragraph, we take judicial notice of the decision and order in *Phillip D. Bertelsen, dba Cove Ranch Management* (Nov. 29, 1986) 12 ALRB No. 27, and the decision of administrative law judge attached thereto. (Evid. Code, § 451, subd. (a).)

[4]The discriminatees presented documentation that they had applied for political asylum and were lawfully present in the United States while their asylum petitions were being processed.

Petitioner sought review in this court. We determined that petitioner had established prima facie that the workers were not work authorized. We remanded the matter for further proceedings on the merits. (*Phillip D. Bertelsen, Inc.* v. *Agricultural Labor Relations Bd.* (1992) 2 Cal.App.4th 506 [3 Cal.Rptr.2d 58].)

On remand, the parties and the ALRB stipulated that the discriminatees were not work authorized. The ALJ reaffirmed his earlier estoppel-based opinion, and petitioner again filed exceptions with the Board. In its second supplemental decision and order (*Phillip D. Bertelsen, Inc., dba Cove Ranch Management* (Dec. 9, 1992) 18 ALRB No. 13), the Board determined that, even though the discriminatees were not authorized by the Attorney General to work in the United States during the interval between their firing and their reinstatement, they nevertheless were entitled to backpay under the ALRA.

Petitioner again filed a timely petition for review in this court.

## DISCUSSION

Under the ALRA, it has been the "usual practice" of the ALRB to treat "all agricultural employees alike, regardless of their immigration status." (*Rigi Agricultural Services, Inc.* (June 14, 1983) 9 ALRB No. 31 at p. 2, fn. 4.) In particular, the ALRB has consistently held that undocumented workers who are present in California are entitled to the same make-whole remedies (backpay and reinstatement) as are other agricultural workers. (*Rigi Agricultural Services, Inc., supra,* 11 ALRB No. 27 at pp. 8-11.) The Legislature has not amended the ALRA to provide that undocumented workers are not entitled to make-whole relief, and no published judicial opinion has addressed the issue.[5]

Petitioner impliedly concedes that, purely as a matter of state law and interpretation of the ALRA, the Board's decision represents settled law.

[5]Courts have "previously stated 'The ALRB is the agency entrusted with the enforcement of this Act and its interpretation of the Act is to be accorded "great respect by the courts and will be followed if not clearly erroneous." ' (*San Diego Nursery Co.* v. *Agricultural Labor Relations Bd.* (1979) 100 Cal.App.3d 128, 140 . . . .) The United States Supreme Court is in accord: 'We are unprepared to hold that this is an impermissible construction of the Act. "[T]he Board's construction here, while it may not be required by the Act, is at least permissible under it . . .", and in these circumstances its position is entitled to deference. . . .' (*NLRB* v. *Transportation Management Corp.* (1983) 462 U.S. 393, 402-403 . . . .)" (*Ruline Nursery Co.* v. *Agricultural Labor Relations Bd.* (1985) 169 Cal.App.3d 247, 259 [216 Cal.Rptr. 162]; see also *In re Kelly* (1983) 33 Cal.3d 267, 277 [188 Cal.Rptr. 447, 655 P.2d 1282] ["We give great deference to the interpretation of a statute by an administrative body authorized to promulgate regulations to promote its purposes, unless that interpretation is clearly erroneous."].)

Petitioner argues, however, that in two separate respects the ALRA was preempted by federal law during the relevant times. First, contends petitioner, undocumented workers were not, as a matter of federal law, "available" for work during the backpay period, and so are not entitled to backpay under the ALRA. Second, petitioner asserts it is a federally registered farm labor contractor: at the relevant times, it was subject to federal criminal penalties if it reinstated the discriminatees; backpay could not accrue under the ALRA so long as federal criminal law prohibited reinstatement. (See 29 U.S.C. § 1851(a).[6])

## A. *Availability for Work.*

*Sure-Tan, Inc.* v. *NLRB, supra,* 467 U.S. 883, involved a leather processor who reported his undocumented employees to the Immigration and Naturalization Service (INS) after a union prevailed in a representation election. The employees were arrested in the ensuing INS raid and accepted voluntary departure in lieu of deportation. (*Id.* at p. 887 [81 L.Ed.2d at pp. 739-740].) After initial NLRB unfair labor practice proceedings, the employer sent letters to the workers in Mexico offering reinstatement provided that such reinstatement "would not subject Sure-Tan to any violations of United States immigration laws." (*Ibid.*)

On appeal from subsequent NLRB remediation orders, the Court of Appeals held that ". . . reinstatement would be proper only if the discharged employees were legally present and free to be employed in the United States when they presented themselves for reinstatement." (*Sure-Tan, Inc.* v. *NLRB, supra,* 467 U.S. at p. 889 [81 L.Ed.2d at p. 741].) While the court held that the employees were in fact "unavailable for work" after deportation and prior to lawful reentry, it directed that a minimum backpay order of six-months' wages would best effectuate the policies of the NLRA. (*Id.* at p. 890 [81 L.Ed.2d at pp. 741-742].)

On certiorari to the Supreme Court, two issues were presented. First, are undocumented aliens "employees" within the meaning of the NLRA? Second, if so, are they entitled to make-whole relief? The court's answers to these questions shed some light on the issues now before us.

---

[6]Title 29 United States Code section 1851(a) provides: "Any person who willfully and knowingly violates this Act or any regulation under this Act shall be fined not more than $1,000 or sentenced to prison for a term not to exceed one year, or both. Upon conviction for any subsequent violation of this Act or any regulation under this Act, the defendant shall be fined not more than $10,000 or sentenced to prison for a term not to exceed three years, or both."

The court first held that the policies of the NLRA would be advanced by including undocumented workers as employees under the NLRA: "If undocumented alien employees were excluded from participation in union activities and from protections against employer intimidation, there would be created a subclass of workers without a comparable stake in the collective goals of their legally resident co-workers, thereby eroding the unity of all the employees and impeding effective collective bargaining." (*Sure-Tan, Inc.* v. *NLRB, supra,* 467 U.S. at p. 892 [81 L.Ed.2d at p. 743].)

Next, the court found that there was no conflict between this result under the NLRA and the immigration policies of the INA. The INA "evinces 'at best evidence of a peripheral concern with employment of illegal entrants.' " (*Sure-Tan, Inc.* v. *NLRB, supra,* 467 U.S. at p. 892 [81 L.Ed.2d at p. 743].) Under the INA, hiring an undocumented worker is not illegal; it is not "a separate criminal offense for an alien to accept employment after entering this country illegally." (*Id.* at p. 893 [81 L.Ed.2d at p. 743].)

Thus, "[c]ounterintuitive though it may be" (*Sure-Tan, Inc.* v. *NLRB, supra,* 467 U.S. at p. 892 [81 L.Ed.2d at p. 743]), NLRA coverage for undocumented workers helps reduce employer incentives to hire illegals, which in turn may create "fewer incentives for aliens themselves to enter in violation of the federal immigration laws." (*Id.* at pp. 893-894 [81 L.Ed.2d at p. 743].) Accordingly, the court concluded that the NLRA does cover undocumented workers. (*Id.* at p. 894 [81 L.Ed.2d at p. 744].) Further, when the employer acts with antiunion animus, it is an unfair labor practice "to report [to INS] or discharge an undocumented alien employee." (*Id.* at p. 896 [81 L.Ed.2d at p. 745].)

As to the second issue before the court, the applicability of make-whole remedies, the court held that such remedies must "be tailored to the unfair labor practice it is intended to redress." (*Sure-Tan, Inc.* v. *NLRB, supra,* 467 U.S. at p. 900 [81 L.Ed.2d at p. 748].) The remedy "must be sufficiently tailored to expunge only the *actual,* and not merely speculative, consequences of the unfair labor practices." (*Ibid.*)

Therefore, a reinstatement order in the case of undocumented workers must be conditioned "on the employees' legal reentry" into the United States, and backpay must be limited if such employees are unavailable for work, i.e., "during any period when they were not lawfully present." (*Sure-Tan, Inc.* v. *NLRB, supra,* 467 U.S. at p. 903, fn. 12 [81 L.Ed.2d at p. 750].)

Soon after *Sure-Tan* was decided, the ALRB considered the "availability for work" issue in *Rigi Agricultural Services, Inc., supra,* 11 ALRB No. 27.

The Board reviewed the history of employment of undocumented workers in California agriculture and readily concluded that the Legislature intended that undocumented workers were to be protected "agricultural employees" under the Act. (*Id.* at pp. 8-12.) The Board concluded that as a matter of legislative intent there was no difference in remedial relief based on a worker's immigration status. (*Id.* at p. 11.)

The Board then considered whether, under *Sure-Tan*, federal immigration law preempted the state's attempt to provide full ALRA protection for undocumented workers. (*Rigi Agricultural Services, Inc., supra*, 11 ALRB No. 27 at p. 12.) In a thorough and well-reasoned analysis, the Board concluded that the ALRA, as interpreted to cover undocumented workers, was not preempted by the INA. (*Id.* at pp. 12-19.)

In summary, the ALRB has never distinguished between documented and undocumented workers in providing make-whole relief under the ALRA. The ALRB has expressly considered the issue of federal preemption under the INA, as interpreted in *Sure-Tan*, and has determined that the INA does not preempt make-whole relief for undocumented workers present in California and physically available for work. In the ensuing eight years, the Legislature has not repudiated the Board's interpretation of the ALRA. Petitioner does not challenge the settled law that make-whole relief for undocumented workers under the ALRA does not conflict with general federal immigration policies as expressed in the INA.

Petitioner does contend, however, that the specific immigration status of these discriminatees renders them "unavailable for work." (See *Phillip D. Bertelsen, Inc. v. Agricultural Labor Relations Bd., supra*, 2 Cal.App.4th at p. 510.) Petitioner argues that the discriminatees "were not permitted to seek employment as a condition of their asylum petitions," inferentially contending this makes the discriminatees' "availability for work" different from that of a worker who simply is illegally present in the country.

Petitioner had the burden of proof "to establish facts which would negative the existence of liability" for backpay. (*Phillip D. Bertelsen, Inc. v. Agricultural Labor Relations Bd., supra*, 2 Cal.App.4th at p. 517, discussing *Frudden Enterprises, Inc. v. Agricultural Labor Relations Bd.* (1984) 153 Cal.App.3d 262 [201 Cal.Rptr. 371].) We held in *Phillip D. Bertelsen, Inc. v. Agricultural Labor Relations Bd., supra*, at page 519 that petitioner had met its initial burden of proof to show that, if petitioner was a farm labor contractor, the discriminatees were not aliens "lawfully admitted for permanent residence" and had "not been authorized by the Attorney General to

accept employment" (29 U.S.C. § 1816, repealed by IRCA, Pub.L. No. 99-603, 100 Stat. 3372, eff. July 1, 1987; see full discussion of the farm labor contractor issue, *post*).[7]

However, no proof has suggested that there are any limitations on discriminatees' presence in this country as petitioners for political asylum that place them in a different category of "availability" than undocumented workers generally. And, as set forth above, general undocumented status does not render workers "unavailable" and ineligible for ALRB backpay relief.

Petitioner also cites *Gutierrez v. Employment Development Department* (1993) 14 Cal.App.4th 1791 [18 Cal.Rptr.2d 705], for the proposition that the discriminatees were unavailable for work because of their immigration status. *Gutierrez* involved the claim for unemployment insurance benefits by a worker lawfully residing in the United States during her period of employment, but lacking work authorization during her claim period. The appellate court affirmed an administrative determination that the employee was unavailable for work, and not entitled to benefits, because she was not work authorized. *Gutierrez* differs from the present case in two important ways.

First, historically, unemployment benefits have been denied to undocumented workers (see *Alonso v. State of California* (1975) 50 Cal.App.3d 242, 253-254 [123 Cal.Rptr. 536, 87 A.L.R.3d 678]), while ALRA make-whole relief has been available to undocumented workers during that same historical period (see *Rigi Agricultural Services, Inc., supra*, 9 ALRB No. 31 at p. 2, fn. 4).

Second, the unemployment benefits system is administered by the states as part of a nationwide program to reduce unemployment, and the nationwide system is coordinated by the United States Department of Labor (DOL). The DOL has promulgated a specific program letter on this subject, stating that ". . . an alien must be legally authorized to work in the United States to be considered 'available for work.'" (*Gutierrez v. Employment Development Department, supra*, 14 Cal.App.4th at p. 1798.) There is no

---

[7]In the previous petition for review, the Board had assumed, without deciding the point, that petitioner was a farm labor contractor. We incorporated that assumption into our opinion. In that petition, we were called upon to review the Board's ruling against petitioner on the sole basis that petitioner had failed to establish that the immigrants were in fact not authorized to work. After determining that petitioner had presented sufficient evidence to shift the burden of proof on the issue of work authorization, we remanded the matter for further proceedings consistent with this shifted burden; the Board additionally was directed to decide remaining issues, as necessary.

such federal directive dealing with California's specific issue of protecting the collective bargaining rights of agricultural workers, many of whom have been natives of Mexico and Central America, throughout the ebb and flood of the tides of "bracero," "amnesty" and other legalization programs. (See *Rigi Agricultural Services, Inc., supra*, 11 ALRB No. 27 at pp. 9-11.)

Accordingly, we conclude the Board here properly determined that the INA did not preempt make-whole relief for the discriminatees who remained in California after discriminatory discharge from employment.

B.  *Federal Farm Labor Contractor.*

We next focus on petitioner's claim that, although it was not unlawful for ordinary employers to hire undocumented workers during the times relevant to this case, and it was not a crime for undocumented workers to accept employment (see *Sure-Tan, Inc.* v. *NLRB, supra*, 467 U.S. at p. 893 [81 L.Ed.2d at pp. 743-744]), petitioner, because it was a registered farm labor contractor, would have committed a crime had it hired undocumented workers. (See 29 U.S.C. former § 1816 and 29 U.S.C. § 1851, as amended.) Petitioner contends that as to farm labor contractors, federal criminalization of such hiring preempts any ALRA imprimatur of hiring through reinstatement or backpay orders.

At issue is the "dual status" employer: a farmer or grove management company that also provides labor to other growers. The parties agree petitioner is such an entity. It owns and farms some acreage, provides full farm management services for other acreage, and provides only harvesting labor at still other acreage. The discriminatees were employed on a harvesting-only crew. With respect to the discriminatees, was petitioner a farm labor contractor, and therefore forbidden by federal law from complying with the make-whole order?[8]

Federal labor laws have never covered the *collective* bargaining rights of agricultural workers. (See 29 U.S.C. § 152(3).) However, federal law for many years has regulated the employment relationship between farmers, labor contractors and underlined individual farm workers. In 1964, Congress passed the Farm Labor Contractor Registration Act of 1963 (FLCRA), Public Law No. 88-582 (Sept. 7, 1964) 78 Statutes at Large 920, as amended, 7 United States Code section 2041 et seq. FLCRA broadly defined "farm labor contractor,"

[8]The parties stipulated below that petitioner is "the agricultural employer" of the discriminatees, and they argue some on this appeal about the meaning of that stipulation. We attribute no significance to it at all, since the stipulation obviously refers to employer status under the ALRA, not under MSPA.

required licensing of and recordkeeping by such contractors, and prohibited ·certain employment practices by such contractors. (H.R.Rep. No. 97-885, 97th Cong., 1st Sess., p. 12 (1982), reprinted at 1982 U.S. Code Cong. & Admin. News, p. 4558.)

In 1983, Congress enacted MSPA, which replaced FLCRA. In addition to general reforms of the registration and recordkeeping requirements of FLCRA, MSPA contained two provisions of particular relevance here:

(1) The definition of "farm labor contractor" was significantly restricted, so as to exclude "agricultural employers" from the definition of farm labor contractors. (See 29 U.S.C. § 1802(7) ["The term 'farm labor contractor' means any person, other than an agricultural employer"].) At the same time, many regulations of employment, transportation and housing of migrant and seasonal farm workers that previously had applied only to farm labor contractors, became applicable to all agricultural employers. (H.R.Rep. No. 97-885, *op. cit. supra*, p. 12, 1982 U.S. Code Cong. & Admin. News, p. 4558.) Petitioner was a registered farm labor contractor under FLCRA, and has maintained that registration through the years involved in this case.

(2) It became illegal for farm labor contractors to employ undocumented workers. Under FLCRA, a farm labor contractor's license could be revoked and civil monetary penalties assessed for hiring undocumented workers. (*Counterman* v. *United States Dept. of Labor* (5th Cir. 1985) 776 F.2d 1247, 1248, fn. 1, quoting 7 U.S.C. former § 2044(b)(6), repealed by MSPA.) As part of IRCA, which penalizes most employers for employment of undocumented aliens (see 8 U.S.C. § 1324a), MSPA's specific prohibition on such employment by farm labor contractors (29 U.S.C. former § 1816) was itself repealed effective July 1, 1987.

We conclude, based on the unambiguous statutory language, that "dual status" employers are treated in MSPA only as agricultural employers, and are not farm labor contractors.

The relevant provisions of MSPA are clear and unambiguous. (See *Mendoza* v. *Wight Vineyard Management* (9th Cir. 1986) 783 F.2d 941, 945.) 29 United States Code section 1802 provides that anyone, *except an agricultural employer* or an agricultural association, who recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker is a "farm labor contractor." (29 U.S.C. § 1802(6)-(7).) An agricultural employer is anyone who "owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, *and who either recruits, solicits, hires, employs, furnishes, or transports* any

migrant or seasonal agricultural worker." (29 U.S.C. § 1802(2), italics added.) Additionally, 29 United States Code section 1803(b) provides that the farm labor contractor portion of MSPA "does not apply to any agricultural employer." Thus, by the plain terms of the statute, one cannot be a farm labor contractor if one is an agricultural employer.

This distinction is also noted in federal regulations implementing MSPA. They provide: "Any farm labor contractor, as defined in the Act, is required to obtain a Certificate of Registration issued pursuant to the Act . . . ." (29 C.F.R. § 500.1(c) (1993).) "Agricultural employers . . . need not obtain Certificates of Registration in order to engage in [labor contracting] activities, even if the workers they obtain are utilized by other persons or on the premises of another." (29 C.F.R. § 500.1(d).)

Despite the language of MSPA and the regulations, petitioner contends that an agricultural employer who furnishes to others labor for harvesting only, and not for full farm management, is a farm labor contractor who must register under MSPA. Petitioner relies on an opinion letter of the federal wage-hour administrator, Opinion Letter No. 1575 (WH-522, Apr. 23, 1984) Labor Law Reporter (CCH) paragraph 31,440, at page 43,759.

The letter deals in large part with the definition of "seasonal agricultural worker." (Opn. Letter No. 1575, *supra*, Lab. L. Rep. (CCH) ¶ 31,440 at p. 43,760.) The final, brief section of the letter states that grove care contractors will be considered "agricultural employers" if they "perform all the farming operations required prior to harvest, . . . However, if such a grove care contractor engages in harvesting operations in any grove where he did not perform all the farming operations prior to harvest he will be considered a farm labor contractor and must comply with the registration requirements under MSPA." (*Id.* at p. 43,761.)

This passage in the opinion letter is impossible to reconcile with the language of MSPA and of DOL's regulations, quoted above. Further, it is wholly inconsistent with the available legislative history of MSPA.

House of Representatives Report No. 97-885, *op. cit. supra*, notes that under FLCRA ". . . the only entity responsible for either performing a duty or refraining from acting in a certain way is the farm labor contractor." (*Id.* at p. 2, 1982 U.S. Code Cong. & Admin. News, p. 4548.) Yet, ". . . the Act has created uncertainty about the status of fixed situs employers which has lead [*sic*] to the mandatory registration of many farmers as farm labor contractors." (*Ibid.*) "Once a grower . . . has been found to be covered under [FLCRA] some of the liabilities which attach as a result of such

coverage are ones which were originally designed with the characteristic of the transient crewleader in mind, and which, when applied[ ] to a stationary employer produce needless paperwork and added administrative expense unnecessary for the effective and purposeful enforcement of the Act." (*Id.* at p. 3, 1982 U.S. Code Cong. & Admin. News, p. 4549.)

The House Report lists several examples "the Committee has learned of." One is particularly germane: "The small local farming operation where the farmer agreed to employ a few migrant workers, whom he had not recruited, for part-time work with provision for housing located on his farm. Since the work was only part-time he permitted such workers to also work for his neighbor but allowed the workers to use his housing with reimbursement from the neighbor. The farmer was consequently found to be a farm labor contractor who had not registered and was not authorized to provide housing—a violation of FLCRA . . . ." (H.R.Rep. No. 97-885, *op. cit. supra,* at p. 4, 1982 U.S. Code Cong. & Admin. News, p. 4550.) While this example was obviously chosen by the report's authors for its "mom and pop" qualities, the situation presented by petitioner is different only in scope, not in kind, from the example.

The report goes on to explain the definition of farm labor contractor: MSPA "states specifically that neither an agricultural employer nor his employees . . . are to be considered as farm labor contractors for any purposes under this Act." (H.R.Rep. No. 97-885, *op. cit. supra,* at p. 8, 1982 U.S. Code Cong. & Admin. News, p. 4554.)

Finally, the report summarizes the relevant portions of MSPA in terms completely inconsistent with the opinion letter and with petitioner's position: "[Section 1803(b)] makes clear that Title I ['Farm Labor Contractors'] of this Act [MSPA] does not apply to any agricultural employer . . . . This is a substantial change from current law. Under FLCRA, any person who by definition was determined to be a farm labor contractor was required to register and meet all the requirements mandated for the issuance of a certificate of registration without regard to the difference between such contractors, both as to the permanency of their operation and as to their mode of doing business. This failure to distinguish created enforcement problems . . . . The structure of [MSPA] was designed to remedy this situation. Accordingly Title I of this Act which sets forth only the registration and certification requirements[9] covers only farm labor contractors *who are not agricultural employers* or associations. The Committee wishes, however, to make absolutely clear that such employers and associations are

---

[9]Not quite. Title I also contained 29 United States Code former section 1816, the prohibition on hiring undocumented workers.

subject to the remaining Titles of this Act." (H.R.Rep. No. 97-885, *op. cit. supra*, at p. 12, 1982 U.S. Code Cong. & Admin. News, p. 4558, italics added.)

The statutory language and the weight of the interpretive materials overwhelmingly establish that an agricultural employer, such as petitioner, is not a "farm labor contractor" within the meaning of 29 United States Code former section 1816.[10] Accordingly, petitioner, who clearly owns and operates farms, is an agricultural employer, and not a MSPA farm labor contractor.[11] Therefore nothing in MSPA preempts the ALRB's make-whole order for the undocumented discriminatees in the present case.

DISPOSITION

The Board's order is affirmed. Costs on this petition are awarded to respondent.

Martin, Acting P. J., and Bianchi, J.,* concurred.

Petitioner's application for review by the Supreme Court was denied June 16, 1994.

---

[10]Each party, in its own way, claims to rely on the only federal appellate case that discusses the opinion letter. At issue in *Mendoza* v. *Wight Vineyard Management, supra*, 783 F.2d 941 was whether the vineyard management defendants were required to register as farm labor contractors under MSPA. The employees contended the companies were required to register because they did not "bear the risk of the operation" of the farms, and therefore did not "own or operate" the farms as "agricultural employers" under MSPA. (783 F.2d at p. 944.) The court determined that the "risk of operation" standard was appropriate only under FLCRA, and that the grove management companies clearly "operated" the groves for MSPA "agricultural employer" purposes. The companies were not dual-capacity entities—i.e., there was no indication the companies simply harvested some vineyards while fully managing others—and the court's brief discussion of the opinion letter sheds no light on the instant problem. (See 783 F.2d at pp. 944-945.) In particular, the court found "reliance upon Opinion No. 522 is unnecessary" to that court's decision. (*Id.* at p. 945.)

[11]We note that for situations arising after July 1, 1987, while 29 United States Code section 1816 has been repealed, the dual-capacity employer issue is still alive. Presently, 29 United States Code section 1851 continues to impose penalties on farm labor contractors not imposed on other employers, including "agricultural employers" under MSPA, for violations of IRCA. (Cf. 8 U.S.C. § 1324a(e).) Certainly, to qualify for this agricultural employer exemption, the farming operation in question need be legitimate, not merely a sham.

*Retired judge of the Kern Superior Court sitting under assignment by the Chairperson of the Judicial Council.